UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHNATHON C. CAMPBELL,          )
                                )
          Plaintiff,            )
                                )
     vs.                        )          Case No. 4:19 CV 1560 ACL
                                )
ANDREW SAUL,                    )
Commissioner of Social Security, )
                                )
          Defendant.            )

**MEMORANDUM**

Plaintiff Johnathon C. Campbell brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the Social Security Administration Commissioner's denial of his

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Campbell's severe

impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform

work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

**I.  Procedural History**

Campbell filed his applications for DIB and SSI on September 17, 2015, claiming that he

became unable to work on April 15, 2015.   (Tr. 223, 225.)   In his Disability Report, Campbell

alleged disability due to HIV/AIDS, anal dysplasia, fibromyalgia, depression, and anxiety.   (Tr.

257.)   Campbell was 30 years of age at the time of his alleged onset of disability.   (Tr. 21.)

His applications were denied initially.   (Tr. 101.)   Following an administrative hearing,

Campbell's claims were denied in a written opinion by an ALJ, dated August 1, 2018.   (Tr. 10-

23.)   Campbell then filed a request for review of the ALJ's decision with the Appeals Council,

which was denied on March 28, 2019.   (Tr. 1-3.)   Thus, the decision of the ALJ stands as the

final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Campbell argues that the ALJ "failed to properly evaluate Step 2."   (Doc.

18 at p. 3.)

## II.   The ALJ's Determination

The ALJ first found that Campbell met the insured status requirements of the Social

Security Act through September 30, 2019.   (Tr. 12.)   He found that Campbell had not engaged

in substantial gainful activity since April 15, 2015, the alleged onset date.   (Tr. 13.)   In

addition, the ALJ concluded that Campbell had the following severe impairments: Human

Immunodeficiency Virus ("HIV") Infection, degenerative disc disease of the thoracic spine,

Reiter's disease[1]/fibromyalgia and migraines.   *Id.*   The ALJ found that Campbell did not have

an impairment or combination of impairments that met or medically equaled the severity of one

of the listed impairments.   (Tr. 15.)

As to Campbell's RFC, the ALJ stated:

After careful consideration of the entire record, the undersigned

---

[1]A form of arthritis caused by an infection that results in pain and inflammation of the joints,
urinary tract symptoms, and eye infection.   *See Stedman's Medical Dictionary,* 1911 (28th Ed.
2006).

> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except lift up to 20 pounds occasionally; lift/carry up to
> 10 pounds frequently.   He can stand/walk for about six hours and
> sit for up to six hours in an eight-hour work day, with normal
> breaks.   He can alternate standing for one hour and sitting for up
> to two hours.   He can occasionally climb ramps or stairs, but
> never climb ladders ropes or scaffolds.   He can never balance.
> He can occasionally stoop, kneel, crouch and crawl.   He should
> avoid exposure to extreme cold.   He should avoid concentrated
> exposure to operational control of moving machinery and exposure
> to hazardous machinery.   He should avoid unprotected heights.

*Id.*

The ALJ found that Campbell was unable to perform any past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as cashier, rental clerk, and ticket taker.   (Tr. 22.)   The ALJ therefore concluded that Campbell was not under a disability, as defined in the Social Security Act, from April 15, 2015, through the date of the decision.   *Id.*

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on September 17, 2015, the
> claimant is not disabled under sections 216(i) and 223(d) of the
> Social Security Act.
>
> Based on the application for supplemental security income filed on
> September 17, 2015, the claimant is not disabled under section
> 1614(a)(3)(A) of the Social Security Act.

(Tr. 22-23.)

### III.   Applicable Law

**III.A.  Standard of Review**

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v.*

*Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as

a whole, we must affirm the administrative decision, even if the record could also have supported

an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal

quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974,

977 (8th Cir. 2003).

## III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any kind of substantial gainful

work which exists … in significant numbers in the region where such individual lives or in

several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social

Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First,

the Commissioner will consider a claimant's work activity.   If the claimant is engaged in

substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343

F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight

abnormality that would not significantly limit the claimant's physical or mental ability to do

basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary

to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine

work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The

sequential evaluation process may be terminated at step two only when the claimant's

impairment or combination of impairments would have no more than a minimal impact on his

ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks

omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the

medical severity of the impairment.   If the impairment meets or equals one of the presumptively

disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id.*   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the

claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. §416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## IV.  Discussion

Plaintiff argues that the ALJ erred at step two of the sequential evaluation when he failed to find that his depression and anxiety were severe impairments.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.   *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant.   *Id.; Dewald v. Astrue*, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard...."   *Kirby*, 500 F.3d at 707.

In determining the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ must use the "special technique" described in 20 C.F.R. § 404.1520a.   The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)."   20 C.F.R. § 404.1520a(b)(1).   The ALJ "must then rate the degree of

functional limitation resulting from the impairment(s)" in four broad functional areas: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage oneself.   20 C.F.R. § 404.1520a(c)(3).   "If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]"   20 C.F.R. § 404.1520a(d)(1).

The ALJ performed the above analysis in this case.   (Tr. 13-14.)   In regard to the functional area of understanding, remembering, or applying information, the ALJ found Campbell had mild limitations.   (Tr. 13.)   The ALJ reasoned that Campbell did not allege any particular issues in this area, and the record shows he was able to prepare meals, shop, provide information about his health, describe his prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and respond to questions from medical providers.   (Tr. 13, 319-74, 428-32, 453-88, 571-600.)

As to the functional area of interacting with others, the ALJ determined that Campbell had no limitations.   (Tr. 13.)   The ALJ explained that, although Campbell reported that he had difficulty engaging in social activities, he is also able to get along with others, spend time with friends and family, deal appropriately with authority, and live with others.   (Tr. 13, 278-79, 521, 523, 560.)   He further noted that the medical evidence shows Campbell had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments.   (Tr. 13, 440, 459, 571, 574, 577.)

The ALJ found that Campbell had mild limitations in the third functional area of concentrating, persisting, and maintaining pace.   (Tr. 13.)   The ALJ explained that, while Campbell reported he has limitations in focusing generally, he said he is able to prepare meals,

watch television, read, manage funds, and handle his own medical care.   *Id.*   The ALJ further noted that the medical record does not mention distractibility.   *Id.*

Finally, in regard to the fourth functional area of adapting or managing oneself, the ALJ found that Campbell had mild limitations.   *Id.*   The ALJ acknowledged Campbell's claim that he had difficulty bathing and caring for pets, but noted that the medical record shows he had appropriate grooming and hygiene, no problem getting along well with providers and staff, normal mood and affect, and no problems with temper control.   (Tr. 13-14, 333, 440, 459, 571, 574, 577.)

Because the ALJ found that Campbell had no more than mild limitations in any of the functional areas, he concluded that Campbell's mental impairments were non-severe.   (Tr. 14.)

The medical evidence of record supports the ALJ's step two determination.   The ALJ first discussed the report of Josephine Hyde, Psy.D.   Campbell saw Dr. Hyde for a psychological consultative evaluation on February 9, 2016.   (Tr. 438.)   Campbell reported that he had been sexually abused by his stepfather as a child, and that he had sought treatment for anxiety and panic as a freshman in college.   (Tr. 438.)   He stated he had been told he has post-traumatic stress disorder ("PTSD").   *Id.*   Campbell reported symptoms of difficulty "turning off his brain," nightmares, anxiety when planning a visit to his family, difficulty sleeping, difficulty with concentration, and chronic pain.   (Tr. 438-39.)   He had been under the care of a counselor specializing in "LGBT client concerns and chronic pain," and had been prescribed "a number of medications to assist with sleep and pain."   (Tr. 439.)   Upon examination, Campbell was spontaneous, coherent, relevant, and logical; pleasant and cooperative throughout the interview; his receptive and expressive language were intact; his mood was stable and euthymic, and a range of affect was expressed that was congruent to content; no preoccupations, disturbances of

thought, or perceptual distortions were present; he was alert and oriented in all spheres; his

concentration was good and he repeated a series of six numbers without mistakes; his remote

memory was intact; he performed simple calculations quickly and accurately; he interpreted

proverbs abstractly; his conceptual thinking was intact; his overall cognitive capacities were at

least in the high average range; and his insight and judgment were good.   (Tr. 440-41.)   Dr.

Hyde found that Campbell had a "moderate impairment not due to psychological functioning" in

his activities of daily living.   (Tr. 441.)   She explained that Campbell lives with his partner and

reports he can work at a normal pace for a day and then collapses for several days due to pain

and exhaustion.   *Id.*   At those times, Campbell stays in bed and does not have the energy to

shower.   *Id.*   On good days, he reported his activity level is variable.   *Id.*   He was previously

able to walk the dog, but now just takes him a few steps away to the corner; he no longer drives;

and he has trouble with walking more than a few steps.   *Id.*   With regard to social functioning,

Dr. Hyde found Campbell has "mild impairment not due to psychological functioning."   (Tr.

442.)   Campbell reported that he no longer goes out due to pain and exhaustion, whereas he used

to be social.   *Id.*   Dr. Hyde found Campbell had no impairment in his appearance and was well-

groomed.   *Id.*   Dr. Hyde found that Campbell had a mild to moderate impairment in his

concentration, persistence, and pace.   *Id.*   She explained that Campbell complained of "brain

fog" that he relates to fibromyalgia, although it may also be related to poor sleep that is a

symptom of both depression and fibromyalgia.   *Id.*   He also reported that he forgets his place

when performing a series of actions, such as getting ready to go out.   *Id.*   Dr. Hyde diagnosed

Campbell with anxiety disorder not otherwise specified.   *Id.*   She stated that Campbell will

likely make a good psychological adjustment to the challenges of coping with chronic pain with

treatment.  *Id.*   Dr. Hyde further stated that she did not believe Campbell's psychological functioning would prevent him from performing work-related tasks.  *Id.*

The ALJ next discussed Campbell's treatment with counselor Christopher Scarberry, LPC, who provided office notes from January of 2015, through December of 2017.   (Tr. 14, 492-564.)   The ALJ stated that Mr. Scarberry's treatment notes—other than a December 2017 note—are handwritten and, for the most part, illegible.   (Tr. 14.)   In the December 2017 treatment note, Mr. Scarberry states that Campbell had first presented in 2015 with symptoms consistent with multiple anxiety disorders as well as PTSD, and that these symptoms "have improved considerably both [by] my client's admission and therapist's observation in sessions." (Tr. 492.)   He stated that Campbell no longer experienced PTSD symptoms, but continues to experience symptoms of generalized anxiety disorder and panic disorder, as well as chronic pain and fatigue.  *Id.*   He had made "marked progress on processing and moving past his past assault, continues to experience debilitating pain and fatigue that causes him to often be unable to leave the house or engage in activities of any sort and has kept him unemployed since he left his last job in 2015."  *Id.*   Mr. Scarberry indicated that he would discuss "termination" of treatment with Campbell in the "near future, possibly 6 more monthly sessions."  *Id.*   The ALJ stated that, although many of Mr. Scarberry's prior handwritten treatment notes are illegible, they reflect Campbell was improving.  (Tr. 14.)   For example, in November of 2017, Campbell reported that he was "pleased with his improvement."   (Tr. 14, 493.)

Mr. Scarberry also submitted an undated letter, in which he stated that Campbell had made progress, although he "deals with significant symptoms in both a mental health and medical aspect."   (Tr. 565.)   He explained that Campbell's mental health symptoms are "anxiety-based," and cause "emotional discomfort, distress, and irritability at times."  *Id.*   Mr.

Scarberry stated that Campbell has also been diagnosed with fibromyalgia, and experiences moderate to severe pain and fatigue. *Id.* He expressed the opinion that Campbell "would be unable to perform duties entailed in most if not all physical jobs due to what I've observed of his physical pain and fatigue concerns and that his mental health symptoms could also inhibit his ability to interact socially at times as well as causing possible problems with job attendance and performance." *Id.*

The ALJ accorded "little weight" to the opinions expressed in Mr. Scarberry's letter. (Tr. 20.)  He first noted that Mr. Scarberry is not an acceptable medical source. (Tr. 20-21.) The ALJ next stated that Mr. Scarberry appears to rely in part on an assessment of an impairment that is outside of Mr. Scarberry's area of expertise, and for which Campbell received no treatment from Mr. Scarberry. (Tr. 21.)  In addition, the ALJ found that Mr. Scarberry's opinions were not supported by the treatment notes. *Id.* He noted that contemporaneous treatment notes of primary care physician Dr. Prelutsky showed normal findings. *Id.*

The ALJ also discussed the opinion of state agency psychological consultant Martin Isenberg, Ph.D. (Tr. 19.)  Dr. Isenberg found that Campbell's mental impairments were not severe, as they resulted in only mild limitations in activities of daily living and maintaining concentration, persistence or pace, and no limitations in maintaining social functioning. (Tr. 77.)  The ALJ stated that he was assigning "substantial evidentiary weight" to this opinion, because Dr. Isenberg was a qualified expert in evaluating psychological issues and his opinion was consistent with the record as a whole. *Id.*

The ALJ's severity determination is supported by the examination findings and opinions of Dr. Hyde, the treatment notes of Mr. Scarberry reflecting substantial improvement, and the opinion of Dr. Isenberg.  Significantly, Dr. Hyde noted no abnormalities on mental status

examination.   (Tr. 440-41.)   Instead, she found Campbell's memory was intact, his thought

processes were logical, his responses were coherent and goal-directed, his intellectual

functioning was high-average, he was pleasant and cooperative, and his mood was stable and

euthymic.   *Id.*

Campbell takes issue with the ALJ's statement in his step two analysis that "[a]ll of the

limitations cited by the claimant resulted from physical complaints rather than from any mental

health limitations."   (Tr. 14.)   He contends that this statement is inaccurate.   In support, he

cites to his testimony that he has a difficult time with short-term memory, sleep, dealing with

"lots" of people, and lack of motivation, which are symptoms of his depression and anxiety.

(Doc. 18 at p. 5.)

The ALJ acknowledged Campbell's testimony regarding symptoms from his mental

impairments, including difficulty focusing, engaging in social activities, sleeping, and memory.

(Tr. 13, 16.)   He was not suggesting that Campbell failed to allege any mental health symptoms.

Instead, the ALJ was referring to the fact that Campbell attributed his limited daily activities to

his symptoms of his physical impairments, rather than his mental impairments.   This finding is

supported by the medical record.   For example, Campbell reported to Dr. Hyde that his daily

activities were limited in that he collapses due to pain and exhaustion, occasionally did not have

the energy to shower, and is unable to walk more than a few steps due to pain and fatigue.   (Tr.

441.)   With regard to social functioning, Campbell reported that he no longer goes out due to

pain and exhaustion.   (Tr. 442.)   Campbell complained of "brain fog" affecting his

concentration that he attributed to fibromyalgia.   *Id.*   Mr. Scarberry's records also support that

Campbell's limitations were caused primarily by his physical impairments.   In his December

2017 treatment note, Mr. Scarberry stated that Campbell experienced "debilitating *pain and*

*fatigue* that causes him to often be unable to leave the house or engage in activities of any sort

and has kept him unemployed since he left his last job in 2015."   (Tr. 492.)

Campbell next argues that primary care physician David Prelutsky, M.D., and Mr.

Scarberry both diagnosed and treated him for depression and anxiety.   He notes that Dr.

Prelutsky prescribed psychotropic medications for his mental impairments.   Campbell contends

that the ALJ erred in discrediting Mr. Scarberry's treatment notes because they are illegible.

Although Campbell admits that many of Mr. Scarberry's treatment notes are illegible, he sets out

legible portions of the records that he claims, "confirm that Plaintiff suffers from depression,

anxiety, fatigue and difficulty dealing with childhood sexual abuse and his current diagnosis of

HIV."   (Doc. 18 at p. 8.)

The ALJ did not dispute that Campbell has been diagnosed with depression and anxiety,

and found that these were established medically determinable impairments.   (Tr. 13.)   The ALJ

nonetheless found that these impairments did not cause more than minimal limitation in

Campbell's ability to perform basic mental work activities and were, therefore, non-severe.   *Id.*

In determining the severity of Campbell's mental impairments, the ALJ discussed Dr.

Prelutsky's records.   He noted that Campbell rarely reported mental health symptoms to Dr.

Prelutsky.   (Tr. 19.)   For example, Campbell saw Dr. Prelutsky in May, June, and August of

2015 for follow-up regarding his chronic conditions, at which time he did not complain of any

mental symptoms.   (Tr. 355-63.)   In November 2015, Campbell complained of depression

despite taking the maximum dosage of a psychotropic medication; along with aches and pains.

(Tr. 486.)   Campbell reported no mental health symptoms at subsequent visits in December

2015, February 2016, May 2016, August 2016, November 2016, December 2016, February

2017, and May 2017.   (Tr. 483, 480, 477, 470, 466, 463, 457, 453.)   In November 2016,

Campbell reported that he was "feeling better mentally," and his therapist and medications were helping him.   (Tr. 468.)   In February 2017, Dr. Prelutsky noted on examination that Campbell was alert, oriented, his cognitive function was intact, he was cooperative, he exhibited good eye contact, and his judgment and insight were "good."   (Tr. 459.)   The ALJ's severity finding is supported by Dr. Prelutsky's treatment notes.

With regard to Mr. Scarberry's records, the ALJ acknowledged that Campbell received counseling from Mr. Scarberry for symptoms related to his anxiety.   (Tr. 14.)   The ALJ did not discuss each of Mr. Scarberry's treatment notes and remarked that many of them were illegible. *Id.*   The ALJ did not, however, ignore these records.   Rather, he summarized that the treatment notes reflect Campbell improved considerably with treatment.   *Id.*   In fact, in December 2017, Mr. Scarberry indicated that he planned to terminate treatment with Campbell due to this improvement.   (Tr. 492.)   "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."   *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998)).   The treatment notes Campbell cites are varied in nature, including complaints of fibromyalgia pain and fatigue, discussions of past childhood trauma, occasional complaints of anxiety, and concerns about family and relationship issues.   Campbell does not point to any findings in these treatment notes that demonstrate his mental impairments cause more than mild limitations in any of the functional areas.

In his undated letter, Mr. Scarberry expressed the opinion that Campbell "would be unable to perform duties entailed in most if not all physical jobs due to what I've observed of his *physical pain and fatigue concerns* and that his mental health symptoms *could also* inhibit his ability to interact socially *at times* as well as causing *possible* problems with job attendance and

performance."   (Tr. 565; emphasis added.)   The ALJ accurately noted that these opinions were based in large part on Campbell's physical impairments, for which Mr. Scarberry was not treating Campbell and were therefore entitled to little weight.   (Tr. 21.)   Moreover, Mr. Scarberry's equivocal statements concerning Campbell's mental limitations do not support the presence of more than mild limitations in the relevant functional areas.   Thus, the ALJ did not err in evaluating Mr. Scarberry's treatment notes or opinions.

Campbell next contends that the ALJ erred in giving substantial weight to the opinion of the non-examining state agency psychologist, Dr. Isenberg.   He notes that Dr. Isenberg only reviewed records from the period of April 15, 2015 to April 15, 2016, and did not have the benefit of much of the medical evidence, including Mr. Scarberry's opinions.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).   It was proper for the ALJ to consider and assign weight to Dr. Isenberg's opinion.   *See, e.g.*, *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014) (noting that state agency medical consultants' opinions supported the RFC finding and stating, "'State agency medical and psychological consultants are highly qualified physicians'" whose expert opinions cannot be ignored by ALJs or the Appeals Council") (quoting SSR 96–6P, 1996 WL 374180, *2 (July 2, 1996)).   The ALJ did not rely solely on Dr. Isenberg's opinion as Campbell suggests, but considered it along with the other medical evidence of record in determining the severity of Campbell's mental impairments.

Campbell also argues that the ALJ erred in failing to consider that his pain "could have had its origin in a psychological disorder."   (Doc. 18 at p. 12.)   He contends that, if the ALJ had properly considered step two, he would have found that Campbell's mental impairments,

including pain and fatigue, have more than a minimal effect on his ability to perform basic work activities.   *Id.* at p. 13.   Campbell, however, has pointed to no evidence showing that his pain or fatigue was caused by his mental impairments.

Finally, as long as the ALJ finds at least one severe impairment, he must proceed with the sequential evaluation and consider all impairments when determining the RFC.   20 C.F.R. § 404.1545(a)(2).   Even if Campbell's mental conditions were severe, automatic reversal is not required.   *Rouse v. Berryhill*, No. 4:17 CV 2511 DDN, 2019 WL 13529384, at *5 (E.D. Mo. 2019) ("[m]ore recent cases ... have tended to hold the ALJ's failure to list all the severe impairments at Step Two is harmless").   Here, the ALJ adequately discussed Campbell's conditions throughout the sequential evaluation, including his depression and anxiety, and gave sufficient reasons for his decision.   Consequently, the ALJ did not err in finding Campbell's mental impairments to be not severe.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.


 s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of September, 2020.